**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY KENT and MARIA SALINAS, individuals, on behalf of themselves, the general public, and those similarly situated, | CASE NO. |
| Plaintiffs, | CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT |
| v. | |
| DAVE & BUSTER'S ENTERTAINMENT, INC., | |
| Defendant. | |
| | JURY TRIAL DEMANDED |

- 1 -

CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 3

THE PARTIES............................................................................................................... 4

JURISDICTION AND VENUE .................................................................................... 5

TOLLING AND RELATED ARBITRATION PROCEEDINGS.................................. 5

SUBSTANTIVE ALLEGATIONS ............................................................................... 7

     A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Trackers. ...................................................................................................... 7

     B.    Defendant Falsely Informed Users That They Could Reject the Website's Use of All Cookies. ............................................................................................................ 13

     C.    The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendant's Website. .................................................. 18

          1.    Facebook Cookies ..................................................................................... 18

          2.    Google Cookies.......................................................................................... 22

          3.    TikTok Cookies .......................................................................................... 27

          4.    Microsoft Bing Cookies ............................................................................ 32

          5.    Twitter Cookies .......................................................................................... 34

     D.    The Private Communications Collected are Valuable. ............................................ 35

PLAINTIFFS' EXPERIENCES ................................................................................... 37

CLASS ALLEGATIONS ............................................................................................. 43

CAUSES OF ACTION ................................................................................................. 45

     First Cause of Action: Invasion of Privacy........................................................... 45

     Second Cause of Action: Intrusion Upon Seclusion............................................... 48

     Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)........................................................... 49

     Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ...................................... 54

     Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation................. 56

     Sixth Cause of Action: Unjust Enrichment............................................................. 58

CLASS ACTION COMPLAINT

Plaintiffs Jeffrey Kent and Maria Salinas ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Dave & Buster's Entertainment, Inc. ("Defendant" or "Dave & Buster's"). Plaintiffs' allegations against Defendant are based upon information, belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

## INTRODUCTION

1. This Class Action Complaint concerns an egregious privacy violation and total breach of consumer trust in violation of California law. When consumers visit Defendant's ecommerce website (www.daveandbusters.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can choose to "Reject All" cookies as shown in the following screenshot:



2. Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. However, unlike other websites, Defendant's Website offers consumers a choice to browse without being tracked, followed, and targeted by third party data brokers and advertisers. But Defendant's promises are outright lies, designed to lull users into a false sense of security. Even after users elect to "Reject All" cookies, Defendant surreptitiously causes several third parties—including Meta Platforms, Inc. (Facebook), Google LLC (Google Analytics), ByteDance Ltd. (TikTok), Microsoft Corporation (Microsoft Bing), and X Corp.

(Twitter) (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and eavesdrop on users' private communications on the Website.

3. Contrary to their express rejection of "All" cookies and tracking technologies on the Website, Defendant nonetheless caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs' and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These third-party cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

4. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

5. This type of tracking and data sharing is exactly what the Website visitors who clicked or selected the "Reject All" button on the Website's cookie consent banner sought to avoid. Defendant falsely told Website users that it respected their privacy and that they could avoid tracking and data sharing when they browsed the Website. Despite receiving notice of consumers' express declination of consent, Defendant defied it and violated state statutes and tort duties owed to Plaintiffs and those similarly situated California Website users.

## THE PARTIES

6. Plaintiff Jeffrey Kent is, and was at all relevant times, an individual and resident of San Francisco, California. Plaintiff Kent intends to remain in California and makes his permanent home there.

7. Plaintiff Maria Salinas is, and was at all relevant times, an individual and resident of Bakersfield, California. Plaintiff Salinas intends to remain in California and makes her permanent home there.

8. Defendant Dave & Buster's Entertainment, Inc. is a Delaware corporation with its headquarters and principal place of business in Dallas, Texas. Defendant owns, operates, and controls numerous similarly named subsidiary and affiliate entities in many states, including Dave & Buster's, Inc.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

10. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

11. Further, the Private Communications and data which Defendant causes to be transmitted to Third Parties are routed through servers located in California.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

13. Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## TOLLING AND RELATED ARBITRATION PROCEEDINGS

14. The delayed discovery rule applies to Plaintiffs' claims. Plaintiffs were unaware that even though they declined all cookies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to their browsers, stored on their devices, and transmitted to the

CLASS ACTION COMPLAINT

Third Parties along with their private user data. As alleged below, Plaintiffs do not have the expertise to test whether the Website honored users' requests to disable all cookies.

15. On or about June of 2024, Plaintiff Salinas notified Defendant that she alleged that Defendant knowingly (and without consent) caused third-party cookies and corresponding data to be stored on consumers' devices and/or transmitted to third parties when they visit the Website despite consumers' clear declination of such third-party cookies. Plaintiff Salinas further notified Defendant that she intended to pursue her claims on behalf of herself and other similarly situated class members.

16. The Website's Terms and Conditions contains an arbitration agreement that purports to require all Website visitors to arbitrate their disputes with Defendants before the American Arbitration Association ("AAA").

17. Accordingly, on August 12, 2024, Plaintiff Salinas filed a demand for arbitration in San Francisco with AAA against Defendant. Plaintiff Salinas asserted claims in the arbitration arising from the same conduct alleged herein.

18. On November 11, 2024, the AAA issued a closing letter following Defendant's failure to comply with the AAA rules, including the submission of a requisite waiver. Exhibit A.

19. Despite exercising reasonable diligence, Plaintiffs were unaware of Defendant's fraudulent and unlawful conduct alleged herein due to its active concealment of material facts, which prevented Plaintiffs from discovering their claims sooner. Further, Plaintiff Salinas' claims were equitably tolled by her demand letter and her filing of the arbitration proceeding because Defendant had notice of the claims (and his intent to pursue them in court as a putative class action). Defendant was not prejudiced in its ability to gather evidence for Plaintiff Salinas' claims since her claims were substantially similar in the demand letter and arbitration proceeding to those asserted in this Complaint. These extraordinary circumstances, including Defendant's intentional misrepresentations and Plaintiff Salinas' pursuit of her claims in the arbitration proceeding, warrant tolling of the statute of limitations to allow Plaintiff Salinas to pursue her

claims in this forum. Plaintiff Salinas acted in good faith and engaged in reasonable conduct in filing her Complaint in this action.

## SUBSTANTIVE ALLEGATIONS

### A.   Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Trackers.

20. Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address so that the Website server to knows where to send the HTTP response.

21. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

22. As a result, Defendant knew that the devices used by Plaintiffs and Class members to access the Website were located in California.

23. Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

24. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

25. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

26. A third-party cookie is set by a third-party domain/webserver (e.g., www.facebook.com; www.google.com; analytics.tiktok.com; bat.bing.com; syndication.twitter.com, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

27. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

CLASS ACTION COMPLAINT

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

CLASS ACTION COMPLAINT

128.  Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to boost website performance and revenue through the collection, utilization, and dissemination of user data.

129.  Defendant owns and operates a chain of entertainment venues that combine a restaurant, bar, and video arcade in a single location. Defendant owns and operates the Website, which allows visitors to receive information about its entertainment venues and, among other things, order food, reserve tables, purchase arcade power cards, and schedule events at those venues. As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

130.  Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies.  Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the software code of its Website, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

CLASS ACTION COMPLAINT

31. Defendant explained the third-party cookies it used on the Website as follows in its Privacy Policy:

> Information We Collect
>
> We may collect and/or obtain certain personal information (such as name and other contact details) through our Web Sites...
>
> In addition, when you visit our Web Sites, we may collect certain information by automated means, such as cookies and web beacons – geolocation information. The information we collect in this manner includes IP addresses, browser characteristics, device characteristics, operating system (e.g. Windows, Mac), language preferences, referring URLs, information on actions taken on our Site, and dates and times of Site visits. A "cookie" is a text file that web sites send to a visitor's computer or other Internet-connected device to uniquely identify the visitor's browser or to store information or settings in the browser. A "web beacon," also known as an Internet tag, pixel tag or clear GIF, links web pages to web servers and their cookies and may be used to transmit information collected through cookies back to a web server. Through these automated collection methods, we obtain "clickstream data," which is a log of content on which a visitor clicks while browsing a website. As the visitor clicks through the website, a record of the action may be collected and stored. We may link certain data elements we have collected through automated means, such as your browser information, with other information we have obtained about you...
>
> If you use Site features operated by third-party social networking services (such as Facebook), we may receive information you have made available to those services, including the geographic location of your mobile device and other information about you (such as name, email address, gender, locale, time zone, languages, social media profile URL, personal website URL, biographical information, birthday, photo, list of devices, education history, work history, hometown, interests, current city, political views, favorite athlete and teams, relationship status and information, religion, name of significant other, and certain security settings information) and your contacts on those services. Some of these social networking services allow you to push content from our Web Sites to your contacts or to pull information about your contacts so you can connect with them on our Web Sites. Some of these services also will facilitate your registration for our Web Sites or enhance or personalize your experience on our Web Sites. You should make sure you understand the information your third-party social networking services may make available to our Web Sites. We may use and disclose the personal information we receive on our Web Sites through third-party social networking services as described in this Privacy Notice....
>
> How We Use the Information We Obtain
>
> We may use the information we obtain through the Web Sites to: ...

CLASS ACTION COMPLAINT

• Offer and provide products and services to you; ...

• Operate, evaluate and improve our business (including developing new products and services; managing our communications; determining the effectiveness of our sales, marketing and advertising; analyzing and enhancing our products, services and Web Sites; and performing accounting, auditing, billing, reconciliation and collection activities);

• Perform data analyses and other processing (including market and consumer research, trend analysis, financial analysis, anonymization, encryption and tokenization of personal information); ...

We may use third-party web analytics services on our Web Sites, such as those of Google Analytics or Adobe Marketing Cloud. The analytics providers that administer these services use technologies such as cookies, web server logs and web beacons to help us analyze how visitors use the Web Sites. The information collected through these means (including IP address) is disclosed to these analytics providers, who use the information to evaluate use of the Web Sites. ...

<u>Internet-Based Advertising</u>

On the Web Sites, we may collect information about your online activities for use in providing you with advertising about products and services tailored to your individual interests. This section of our Privacy Notice provides details and explains how to exercise your choices. You may see certain ads on other web sites based on your visits to our Web Sites because we participate in advertising networks administered by third-party vendors. Ad networks allow us to target our messaging to users through demographic, interest-based and contextual means. These networks track your online activities over time by collecting information through automated means, including through the use of cookies, web server logs and web beacons. The networks use this information to show you advertisements that are tailored to your individual interests. The information our ad network vendors collect includes information about your visits to web sites that participate in the vendors' advertising networks, such as the pages or advertisements you view and the actions you take on the web sites. This data collection takes place both on the Web Sites and on third-party web sites that participate in the ad networks. This process also helps us track the effectiveness of our marketing efforts. To learn more about how to opt out of ad network interest-based advertising, click here.[1]

---

[1] Dave & Buster's Website Privacy Policy (effective as of 1/1/2020) (available at https://www.daveandbusters.com/us/en/terms-of-use/privacy-policy) (the "Privacy Policy"). Based on information and belief, this version was in effect at the time of Plaintiffs' rejection of cookies on the Website.

CLASS ACTION COMPLAINT

**B.    Defendant Falsely Informed Users That They Could Reject the Website's Use of All Cookies.**

32. When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "This website uses cookies and other tracking technologies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners." The banner then purported to provide users the opportunity to "Reject All" cookies by clicking or selecting the button labeled as such, as shown in the following screenshots from the Website, in which the banner has been cropped in half, with each half separated and enlarged for readability:



33. The complete banner appeared as follows:

CLASS ACTION COMPLAINT

34. Plaintiffs and other Website users who clicked or selected the "Reject All" button, thereby indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Website, could then continue to browse the Website, as the popup cookie consent banner disappeared.

35. Defendant's popup cookie consent banner led Plaintiff, and all those Website users similarly situated, to believe that they declined or rejected all cookies and tracking technologies, especially those used to "analyze performance and traffic" and "share information about your use of our site with our social media, advertising and analytics partners." The banner further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Reject All" button.

36. Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other Website users' wishes. When Plaintiffs and other California Website users clicked or selected the "Reject All" button, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website. Nevertheless, Defendant caused the Third Party tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

37. In particular, when users clicked or selected the "Reject All" button, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user

identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

38. Some aspects of the operations of the Third Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a Website user's device and browser to Third Parties even after the user clicked or selected the "Reject All" button on the Website's popup cookie consent banner.



CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

39. The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.daveandbusters.com. The screenshots depict only network traffic occurring **after** the user rejected all cookies using the cookie banner. As shown above, despite the user's rejection of all cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.facebook.com; www.google.com; analytics.tiktok.com; bat.bing.com; syndication.twitter.com; and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third

CLASS ACTION COMPLAINT

parties. These screenshots demonstrate that the Website caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected all cookies and tracking technologies by clicking or selecting the "Reject All" button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all cookies.

40. Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

41. As users interact with the Website, even after clicking or selecting the "Reject All" button, thereby declining or rejecting the use of cookies and similar technologies for Website traffic analysis, as well as the sale or sharing of the user's personal information with Defendant's third party social media, advertising, and analytics partners, for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data.  The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

CLASS ACTION COMPLAINT

42. The Third Party code that the Website causes to be loaded and executed by the user's browser becomes a wiretap when it is executed because it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

C.    **The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendant's Website.**

1.    **Facebook Cookies**

43. Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices to and from the **facebook.com** domain, even after users elect to "Reject All" cookies. This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[2] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

44. The facebook.com cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For example, the Website causes the following data to be sent to Meta when the user clicks the "View Games" button on the Website:

---

[2] https://www.facebook.com/privacy/policies/cookies/.

| Key | Value |
|---|---|
| id | 681152002677481 |
| ev | SubscribedButtonClick |
| dl | https%3A%2F%2Fwww.daveandbusters.com%2Fus%2Fen%2Fhome |
| rl | |
| if | false |
| ts | 1719319196074 |
| cd[buttonFeatures] | %7B"classList"%3A"mt-3%20btn%20btn-primary%20view-more"%2C"destination"%3A"https%3A%2F%2Fwww.daveandbusters.com%2Fus%2Fen%2Fplay"%2C"id"%3A""%2C"imageUrl"%3A"linear-gradient(rgb(4%2C%206%2C%2081)%2C%20rgb(21%2C%2024%2C%20154))"%2C"innerText"%3A"View%20Games"%2C"numChildButtons"%3A0%2C"tag"%3A"a"%2C"type"%3Anull%2C"name"%3A""%7D |
| cd[buttonText] | View%20Games |
| cd[formFeatures] | %5B%5D |
| cd[pageFeatures] | %7B"title"%3A"Dave%20%26%20Buster%27s%20%7C%20Events%20-%20Arcade%20-%20Sports%20Bar%20and%20Restaurant"%7D |
| sw | 1440 |
| sh | 900 |
| v | 2.9.158 |
| r | stable |
| ec | 3 |
| o | 4126 |
| fbp | fb.1.1719319168422.640003013468298624 |
| ler | empty |
| cdl | API_unavailable |
| it | 1719319168192 |
| coo | false |
| es | automatic |
| tm | 3 |
| rqm | GET |

CLASS ACTION COMPLAINT

45. The "ev" parameter is an "Event." In this case, the event is a "SubscribedButtonClick" indicating to Facebook that the user has clicked a specific button on the Website.

46. The "dl" parameter is the "Document Location." It tells Facebook the specific webpage on which the Event occurred – in this case, https://www.daveandbusters.com/us/en/home.

47. The "ts" parameter corresponds to a "Timestamp," and tells Facebook the exact time—down to the millisecond—at which the user clicked the button.

48. The "fbp" parameter is the Facebook Browser ID, and is used to track the user's activity across the Internet.

49. The "sw" and "sh" parameters stand for "screen width" and "screen height," and correspond to the display the user was viewing when the event was recorded.

50. Cookies are sent along with all data transmissions to Meta. For instance, the following cookies were sent along with the SubscribedButtonClick event:



51. The c_user cookie shown above enables Facebook to identify a specific user when they are logged in to their account. The c_user cookie stores a user's unique ID, which is

CLASS ACTION COMPLAINT

associated with their Facebook profile. This ID enables Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

52. In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies enable Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[3] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[4]

53. The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).[5]

54. Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a

---

[3] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect.

[4] https://allaboutcookies.org/what-data-does-facebook-collect.

[5] *Id.*

newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie  to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

55. Further, along with all of this data, the Facebook software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Google:

user-agent          Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7)
                    AppleWebKit/537.36 (KHTML, like Gecko) Chrome/
                    126.0.0.0 Safari/537.36

56. The "user-agent" corresponds to the device and browser that the user has used to access the Website.

### 2.    Google Cookies

57. Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users "Reject All" cookies, to and from the **www.google.com** and **analytics.google.com** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[6] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's

---

[6] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

CLASS ACTION COMPLAINT

DoubleClick cookies.[7] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[8]

58. Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[9] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

59. Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports

---

[7] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

[8] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[9] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

CLASS ACTION COMPLAINT

that provide insights into [] business[es]."[10] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[11]

60. Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[12]

61. For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's domain, at analytics.google.com:

---

[10] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

[11] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

[12] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

CLASS ACTION COMPLAINT

62. The "npa" parameter refers to "Non-Personalized Ads." When npa is set to 1, it indicates non-personalized ads preference is enabled. Here, npa is set to 0, indicating that standard (personalized) ads are enabled.

63. The "dl" parameter tells Google what webpage the user was viewing on the Website. Here, "dl" corresponds to https://www.daveandbusters.com/us/en/home.

64. The parameters beginning in "ua…" tell Google extensive information about the user's device and browser, including the specific operating system, browser brand, and device processor.

65. Along with this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the "NID" cookie to be sent to Google's domain:



66. The "NID" cookie is used for Google advertising. Specifically, it is used to show Google ads to users.[13]

---

[13] *See* https://policies.google.com/technologies/cookies?hl=en-US.

CLASS ACTION COMPLAINT

67. Further, along with all of this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Google.

68. Finally, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

69. Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

70. Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[14]

71. Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data

_____

[14] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[15] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

### 3.    TikTok Cookies

72. Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to "Reject All" cookies, to and from the **analytics.tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok, a social media platform owned by ByteDance Ltd., known for short-form video sharing. [16] The TikTok platform is used to create and share videos, and it utilizes cookies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[17]

73. TikTok utilizes cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies (such as the Website). These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the

---

[15] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

[16] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[17] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

user's experience (including ads) on TikTok."[18] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched events are used to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies enable TikTok to recognize and track users across different sessions and domains (i.e., cross-site tracking) and to collect and synchronize user data to observe and evaluate TikTok user behavior.

74. These cookies enable TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including *email addresses and phone numbers*; (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers, and (xi) geolocation data in the form of the IP address.[19]

75. For example, the TikTok software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to TikTok's domain, at analytics.tiktok.com:

---

[18] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[19] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business: Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business: About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

```
POST    200    https://analytics.tiktok.com/api/v2/pixel/act

Request  Header  Query  Body  Cookies  Raw  Summary  +         PLAIN ⌄

 1 ⌄ {
 2     "_inspection": {},
 3     "action": "Click",
 4 ⌄   "auto_collected_properties": {
 5       "page_trigger": "Click",
 6 ⌄     "trigger_element": {
 7 ⌄       "attributes": {
 8           "class": "nav-link active",
 9           "id": "nav-1-tab",
10           "type": "button"
11         },
12         "inner_text": "Play Games",
13         "num_child_buttons": 0,
14 ⌄       "position": {
15           "x": 179.5,
16           "y": 533.21875
17         },
18         "tag": "BUTTON",
19         "timestamp": "2024-06-25T12:39:53.929Z",
20         "xpath": "/HTML/body[1]/div[1]/div[1]/div[1]/main[1]/div
             [1]/div[1]/div[4]/div[1]/div[1]/div[1]/div[1]/div
             [1]/nav[1]/div[1]/button[2]"
21       }
22     },
23 ⌄   "context": {
24 ⌄     "ad": {
25         "jsb_status": 2,
26         "sdk_env": "external"
27       },
28 ⌄     "device": {
29         "platform": "pc"
30       },
31       "index": 0,
32 ⌄     "library": {
33         "name": "pixel.js",
34         "version": "2.2.0"
35       },
36 ⌄     "page": {
37         "load_progress": "2",
38         "referrer": "",
39         "url": "https://www.daveandbusters.com/us/en/home"
40       },
41       "pageview_id": "pageId-1719319168979-6779631310214.0.0",
42 ⌄     "pixel": {
43         "code": "C25C8HAQV14ORDHR6T0",
44         "codes": "C25C8HAQV14ORDHR6T0",
45         "runtime": "1"
```

CLASS ACTION COMPLAINT

```
46        },
47        "session_id":
          "f6990caa-32ef-11ef-bb78-08c0eb4a3a7a::_A3Ove9agXaMdBnO0zH7
          ",
48 ∨      "user": {
49          "anonymous_id": "JdnLGu13uX0b_xvFjYcGhvunxvF"
50        },
51        "userAgent": "Mozilla/5.0 (Macintosh; Intel Mac OS X
          10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.
          0.0.0 Safari/537.36",
52        "variation_id": "test_2_single_track"
53      },
54      "event_id": "",
55      "is_onsite": false,
56      "message_id": "messageId-1719319193929-4666762746478",
57      "properties": {},
58 ∨    "signal_diagnostic_labels": {
59 ∨      "hashed_email": {
60          "label": "missing"
61        },
62 ∨      "hashed_phone": {
63          "label": "missing"
64        },
65 ∨      "raw_auto_email": {
66          "label": "missing"
67        },
68 ∨      "raw_auto_phone": {
69          "label": "missing"
70        },
71 ∨      "raw_email": {
72          "label": "missing"
73        },
74 ∨      "raw_phone": {
75          "label": "missing"
76        }
77      },
78      "timestamp": "2024-06-25T12:39:53.929Z"
79    }
```

76. The data includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a browsing session, including page views and conversions, to a particular user to enhance advertising measurement, attribution, and targeting.[20]

77. The data discloses to TikTok that the user clicked a button labeled "Play Games."

---

[20] *See, e.g.,* How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/).

CLASS ACTION COMPLAINT

78. The data also discloses to TikTok, through the "userAgent" and "device.platform" parameters, the user's device and browser information.

79. The data further indicates, among other things, that the user has viewed the url https://www.daveandbusters.com/us/en/home.

80. Along with this data, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes various cookies to be transmitted to TikTok's domain:

| POST | 200 | https://analytics.tiktok.com/api/v2/pixel/act |
|---|---|---|

**Request** Header Query Body **Cookies** Raw Summary +

| Key | Value |
|---|---|
| _ttp | 2i9eoovPAsE9Cg8GwHjTDpE607O |
| passport_csrf_token | 676133ae234478dab50d96ed12be7006 |
| passport_auth_status_ss | 71158eb97265bb52116e7accc1a88d24%2C |
| uid_tt_ss | 1f29616ae0c7c1d2e08ac19c0e56ec9d602d2abe8ef19fcd4449e2cb4cfbd528 |
| sessionid_ss | 01733a64788c5b4bdd3c0934937f7d7a |
| ssid_ucp_v1 | 1.0.0-KDc3ODVlOTJmNjc2YTJlYzNiNzk3MzU0ZWJhN2VkZji3YjhhOGFkZDQKHwiuiKjYnYTvimUQo57bswYYswsgDDCp-NaoBjglQBlQBBoHdXNlYXN0N0NSlgMDE3MzNhNjQ3ODhjNWI0YmRkM2MwOTM0OTM3ZjdkN2E |
| ttwid | 1%7CN3Vxq4Q5i0doRBx5d1yabUMfImR3fyLFsGW8Vv6BklU%7C1719062310%7C907a9618472fe0e3ef8a2d0979e1df3d5e645c6ae55111e95ca5c2e294dfdbdc |
| msToken | z2F925gMpwnviR_ylmn-flNW9E974VVubj7nMLcvoezvKEv1w7KJfXTmFPshxBzy8eNEbWZKtm8_LBApqeUKGjskQrlLAaHMrnaXi87ecbwBhLpUJWnWf2a7uyFw7tKEjhkS66ZOPDww |

81. According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[21]

82. TikTok's documentation also confirms that "[t]he 'ttwid' first-party cookie is for analytics and web optimisation."[22]

---

[21] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[22] https://www.tiktok.com/legal/page/global/tiktok-website-cookies-policy/en.

CLASS ACTION COMPLAINT

83. Further, along with all of this data, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to TikTok:

user-agent          Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7)
                    AppleWebKit/537.36 (KHTML, like Gecko) Chrome/
                    126.0.0.0 Safari/537.36

84. As discussed above with respect to Facebook, the "user-agent" corresponds to the device and browser that the user has used to access the Website.

85. Finally, the data sent to TikTok includes the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

86. By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement; advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyze user responses to ads and content).[23]

87. Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields. …TikTok will use hashed information to link event information to people on TikTok. Tiktok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[24]

### 4.    Microsoft Bing Cookies

---

[23] *See* TikTok for Business: Using Cookies with TikTok Pixel
(available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[24] TikTok for Business: How to set up Automatic Advanced Matching (available at https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).

CLASS ACTION COMPLAINT

88. Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to "Reject All" cookies, to and from the **bat.bing.com** domain. "The webpage bat.bing.com is a host for Bing Ads Conversion tracking code. This webpage is owned by Microsoft[.]"[25] The domain is associated with Bing, Microsoft's search engine, as well as Microsoft's digital advertising and analytics platforms. When a webpage loads a bat.bing.com cookie, it "tells Microsoft Advertising about the user visits to [the] webpage."[26] Microsoft uses bat.bing.com cookies to "record[] what customers do on [a] website and send[] that information to Microsoft Advertising."[27] Microsoft then serves targeted ads to web users across its extensive ad networks, which utilizes its "rich" supply of gathered data to "reach more than a billion people[.]"[28]

89. Bat.bing.com cookies collect consumers' (i) search history and browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information (including zip code[29]; gender[30]; age[31] (including identifying whether that person is a minor or not)); (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses). Bat.bing.com updates this information each time a user clicks on a website hosting a third-party bat.bing.com cookie. Bat.bing.com keeps this user data for six months.

---

[25] https://answers.microsoft.com/en-us/msadvs/forum/all/does-batbing-track-your-browser-searches-and-sites/0a402f00-60c2-4d54-bd7d-81b67ccc7f13.

[26]https://help.ads.microsoft.com/apex/index/3/en/56959#:~:text=The%20most%20important%20request%20is,making%20when%20your%20webpage%20loads.

[27] https://help.ads.microsoft.com/#apex/ads/en/56960/1.

[28] https://answers.microsoft.com/en-us/msadvs/forum/all/opt-out-of-audience-ads/753bc0fc-c04f-4e20-a94a-abaa950ccf31#:~:text=When%20you%20come%20to%20Microsoft,and%20rich%20first%2Dparty%20data.

[29] https://help.ads.microsoft.com/#apex/ads/en/60212/0.

[30] *Id.*

[31] *Id.*

CLASS ACTION COMPLAINT

90. Bat.bing.com cookies help Microsoft track users' interactions with ads (e.g., clicking a link or making a purchase) and provide valuable metrics that advertisers use to measure ad campaign performance. Further, bat.bing.com cookies allow Microsoft to obtain and store user data to "help [website owners] focus a campaign or ad group on potential audiences who meet [website owners'] specific criteria, so [website owners] can increase the chance that [consumers] see [website owners'] ads."[32] Further, bat.bing.com offers [website owners] valuable "conversion tracking," which is a "measure [of] the ROI (return on investment) of your advertising campaign by letting [website owners] assign a monetary value to the activities people complete on [Defendant's] website after clicking [website owners'] ad."[33]

91. Microsoft also utilizes bat.bing.com data for its own purposes, including by using the data to tailor content and target advertisements to users. This profile enables Microsoft to deliver highly targeted ads within Microsoft's extensive advertising network. Microsoft's revenue from its advertising network program has exceeded $10 billion as of 2022.[34]

## 5. Twitter Cookies

92. Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to "Reject All" cookies, to and from other domains, including twitter.com.

93. The **twitter.com** domain is associated with X Corp, formerly known as Twitter. X Corp's cookies collect a wide range of user data, including a user's browsing history; IP address; interactions with advertisements; data used to authenticate and secure personal accounts; and reading a device's local storage.[35] X Corp uses the collected user data to target

---

[32] https://help.ads.microsoft.com/#apex/ads/en/60212/0.

[33] https://help.ads.microsoft.com/#apex/ads/en/56680/2.

[34] https://digiday.com/media/microsofts-ad-revenue-hit-10b-and-its-investing-is-a-sleeping-giant-about-to-wake/.

[35] *See* https://help.x.com/en/rules-and-policies/x-cookies.

CLASS ACTION COMPLAINT

users with personalized advertisements and content, generate analytics on website interaction, and to conduct unspecified "Research and Development."[36]

94. For example, the following cookies are sent to X Corp when a user visits Defendant's Website:



95. According to X's documentation, the personalization_id cookie "tracks activities on and off Twitter for a personalized experience."[37]

96. X's documentation further states that the "guest_id_marketing" cookie "is used for advertising when logged out."[38]

97. These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

### D.    **The Private Communications Collected are Valuable.**

98. As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's

---

[36] *Id.*

[37] https://help.x.com/en/rules-and-policies/x-cookies.

[38] *Id.*

and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

99. The Private Communications that the Third Parties track and collect by way of the cookies on the Website are valuable to Defendant as well as the Third Parties. Defendant can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendant wanted to market certain of its entertainment venue features to consumers in California, Defendant could use the data collected by the Third Parties to monitor the location of users who visit webpages related to specific venue features, then advertise similar products or services to those particular users when they visit other webpages. The third-party cookies also enable Defendant to target online advertisements to users when they visit *other* websites, even those completely unrelated to Defendant and its products.

100. Data about users' browsing history enables Defendant to spot patterns in users' behavior on the Website and their interests in, among other things, Defendant's entertainment venues. On a broader scale, it enables Defendant to gain an understanding of trends happening across its brands and across the entertainment market. All of this helps Defendant further monetize its Website and maximize revenue by collecting and analyzing user data.

101. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[39] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

---

[39] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

CLASS ACTION COMPLAINT

102. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

103. Through its false representations and aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to track users' Private Communications on the Website using third-party cookies, Defendant is unjustly enriching itself at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

**PLAINTIFFS' EXPERIENCES**

**Plaintiff Jeff Kent:**

104. Plaintiff Kent visited the Website to seek information about Dave & Buster's entertainment venues, while located in California, on one or more occasions during the last four years.

105. Plaintiff Kent's visit to the Website was consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Kent is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

106. When Plaintiff Kent visited the Website, the Website immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Reject All" cookies button. Plaintiff Kent viewed Defendant's representation on the popup cookie consent banner that, "This website uses cookies and other tracking technologies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners." Plaintiff Kent also viewed Defendant's additional representation that, rather than choosing to "Accept Cookies[,]" users could instead "Reject All" cookies.

CLASS ACTION COMPLAINT

107. Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Kent selected and clicked the "Reject All" cookies button. Plaintiff Kent believed that selecting the "Reject All" cookies button on the popup cookie consent banner found on the Website would allow him to opt out of, decline, and/or reject "All" cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing Website traffic analysis, and other functions).

108. In selecting the "Reject All" button, Plaintiff Kent gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Kent specifically rejected, based on Defendant's representations, those cookies used to "analyze performance and traffic on our website" and share information with third parties, including Defendant's "social media, advertising and analytics partners." In reliance on these representations and promises, only then did Plaintiff Kent continue browsing the Website.

109. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used to analyze traffic on the Website and share information about Plaintiff Kent's use of the Website with Defendant's social media, advertising, and analytics partners, to be placed on Plaintiff Kent's device and/or transmitted to the Third Parties along with user data, without Plaintiff Kent's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Kent that he could reject the use and/or placement of "All" cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Kent believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with their user data; rather, Defendant had already caused that to happen.

CLASS ACTION COMPLAINT

110. Then, as Plaintiff Kent continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Kent's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in analyzing traffic on the Website and sharing information about Plaintiff Kent's use of the Website with Defendant's social media, advertising, and analytics partners on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Kent's Private Communications as Plaintiff Kent browsed the Website.

111. Defendant's representations that consumers could "Reject All" cookies while Plaintiff Kent and users browsed the Website, or at least those involved in analyzing traffic on the Website and sharing information about Plaintiff Kent's use of the Website with Defendant's social media, advertising, and analytics partners, were untrue. Had Plaintiff Kent known this fact, he would not have used the Website. Moreover, Plaintiff Kent reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all cookies, Plaintiff Kent would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

112. Plaintiff Kent continues to desire to browse content featured on the Website. Plaintiff Kent would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Kent would likely browse the Website again in the future, but will not do so until then. Plaintiff Kent regularly visits websites that feature content similar to that of the Website. Because Plaintiff Kent does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all cookies and tracking technologies, Plaintiff Kent will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits

Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Kent is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Maria Salinas**:

113. Plaintiff Salinas visited the Website to seek information about Dave & Buster's entertainment venues, while located in California, on one or more occasions during the last four years.

114. Plaintiff Salinas' visits to the Website were consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Salinas is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

115. When Plaintiff Salinas visited the Website, the Website immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner, which provided the option to select the "Reject All" cookies button. Plaintiff Salinas viewed Defendant's representation on the popup cookie consent banner that, "This website uses cookies and other tracking technologies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners." Plaintiff Salinas also viewed Defendant's additional representation that, rather than choosing to "Accept Cookies[,]" users could instead "Reject All" cookies.

116. Consistent with typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Salinas selected and clicked the "Reject All" cookies button. Plaintiff Salinas believed that selecting the "Reject All" cookies button on

the popup cookie consent banner found on the Website would allow her to opt out of, decline, and/or reject "All" cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing Website traffic analysis, and other functions).

117. In selecting the "Reject All" button, Plaintiff Salinas gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Salinas specifically rejected, based on Defendant's representations, those cookies used to "analyze performance and traffic on our website" and share information with third parties, including Defendant's "social media, advertising and analytics partners." In reliance on these representations and promises, only then did Plaintiff Salinas continue browsing the Website.

118. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used to analyze traffic on the Website and share information about Plaintiff Salinas' use of the Website with Defendant's social media, advertising, and analytics partners, to be placed on Plaintiff Salinas' device and/or transmitted to the Third Parties along with user data, without Plaintiff Salinas' knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Salinas that she could reject the use and/or placement of "All" cookies and tracking technologies while she browsed the Website was false. Contrary to what Defendant made Plaintiff Salinas believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

119. Then, as Plaintiff Salinas continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Salinas' clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user

data, including those involved in analyzing traffic on the Website and sharing information about Plaintiff Salinas' use of the Website with Defendant's social media, advertising, and analytics partners on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Salinas' Private Communications as Plaintiff Salinas browsed the Website.

120. Defendant's representations that consumers could "Reject All" cookies while Plaintiff Salinas and users browsed the Website, or at least those involved in analyzing traffic on the Website and sharing information about Plaintiff Salinas' use of the Website with Defendant's social media, advertising, and analytics partners, were untrue. Had Plaintiff Salinas known this fact, she would not have used the Website. Moreover, Plaintiff Salinas reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all cookies, Plaintiff Salinas would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

121. Plaintiff Salinas continues to desire to browse content featured on the Website. Plaintiff Salinas would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Salinas would likely browse the Website again in the future, but will not do so until then. Plaintiff Salinas regularly visits websites that feature content similar to that of the Website. Because Plaintiff Salinas does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all cookies and tracking technologies, Plaintiff Salinas will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by

"developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Salinas is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

122. Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

**Class**: All persons who browsed the Website in the State of California after clicking or selecting the "Reject All" button in the popup cookies consent banner.

123. This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

124. **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

125. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to reject all cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

126. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.      Whether Defendant's actions violate California laws invoked herein; and

b.      Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

127. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, rejected all cookies, and had their confidential Private Communications intercepted by the Third Parties.

128. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

129. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to

CLASS ACTION COMPLAINT

which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

130. Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

131. To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

132. Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

133. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "Reject All" cookies and tracking technologies before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner on the Website, Plaintiffs and Class members rejected all

cookies and reasonably expected that their rejection of all cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they rejected all such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

134. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

135. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and Class members' privacy, by allowing third parties to learn intimate details of their lives, and target

CLASS ACTION COMPLAINT

them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

136. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

137. Defendant's intrusion into Plaintiffs' and Class members' privacy was also highly offensive to a reasonable person.

138. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

139. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

140. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

141. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion**

142. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

143. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

144. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

145. The Third Parties' tracking and collecting of Plaintiffs' and Class members' Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to "Reject All" cookies.

146. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Website based on Defendant's promise that users could "Reject All" cookies, as well as state criminal and civil laws designed to protect individual privacy.

147. Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could "Reject All" cookies when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be

transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they rejected all cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

148. Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

149. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

150. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

151. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

### **Third Cause of Action**: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)

152. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

153. California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent

from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

154. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

155. Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

156. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

157. CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

158. Defendant is a "person" within the meaning of California Penal Code § 631.

159. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

160. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

161. Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

162. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

163. At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

164. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

165. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

166. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

167. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to reject cookies in the consent banner.

168. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' and Class members' California-located devices. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

169. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

170. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

171. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant.  Plaintiff, Class members, and the general public continue to be at risk because Plaintiff, Class members, and the general public frequently use the internet to search for information and content related to entertainment venues. Plaintiff, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiff, Class members, and the general public have no practical way to know if their request to reject  cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action**: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)

172. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

173. The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

174. California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

175.  A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire

or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

176. The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

177. At all relevant times, Defendant caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members' IP addresses and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

178. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

179. Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by clicking the "Reject All" cookies button in the cookie consent banner.

180. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

181. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

182. Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

183. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

184. Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could "Reject All" cookies.

185. However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked or selected the "Reject All" cookies button in the popup cookie consent banner. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to "Reject All" cookies.

186. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'— including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to "Reject All" cookies, which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not

so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

187. Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

188. Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

189. Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

190. Defendant's representation that consumers could reject all cookies (including "cookies and other technologies [used] to… analyze performance and traffic on our website…[and] share information about your use of our site with our social media, advertising and analytics partners") if they clicked or selected the "Reject All" cookies button was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner prior to their interactions with the Website. Had Defendant disclosed that it caused third-party cookies to be stored on Website visitors' devices that are related to Website traffic analysis, or that share information with Defendant's social media, advertising and analytics partners, even after they choose to reject all such cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

CLASS ACTION COMPLAINT

191. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject "All" cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

192. Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

193. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

194. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Sixth Cause of Action</u>: Unjust Enrichment**

195.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

196.    Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

197.    Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "Reject All" cookies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information,

referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected all such cookies.

198. Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

199. Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

200. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

201. It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

202. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

203. Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return them to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

204. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## **PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiff, on behalf of themselves and the Class members, respectfully requests judgment against Defendant as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.    An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.    An award of punitive damages;

D.    An award of nominal damages;

E.    An order for full restitution;

F.    An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G.    An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.    For reasonable attorneys' fees and the costs of suit incurred; and

I.    For such further relief as may be just and proper.

Dated: October 17, 2025

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier/s/*

Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

# EXHIBIT A



1101 Laurel Oak Road
Voorhees, NJ 08043

November 11, 2024

Seth A. Safier, Esq.
Gutride Safier LLP
100 Pine Street
Suite 1250
San Francisco, CA 94111
Via Email to: Seth@gutridesafier.com

Michael J. Chilleen, Esq.
Sheppard, Mullin, Richter & Hampton, LLP
650 Town Center Drive
10th Floor
Costa Mesa, CA 92626-1993
Via Email to: MChilleen@sheppardmullin.com

**Case Number: 01-24-0007-2225**

Maria Salinas
-vs-
Dave & Buster's, Inc.

Dear Parties:

Further to the AAA's letter dated October 29, 2024, Dave & Buster's, Inc. has failed to submit the previously requested waiver within the time required; accordingly pursuant to California Code of Civil Procedure Section 1281.97, we have administratively closed our file in this matter.

Any payment submitted by a party will be refunded shortly.

Additionally, and because Dave & Buster's, Inc. failure to remit the foregoing constitutes a failure to adhere to our policies regarding consumer claims, we may decline to administer future consumer arbitrations involving Dave & Buster's, Inc. The AAA's consumer policies can be found on the AAA's website, www.adr.org. We request that Dave & Buster's, Inc. remove the AAA name from its consumer arbitration clause so that there is no confusion to the public regarding our decision.

If Dave & Buster's, Inc. advises the AAA in the future of its intention to comply with the AAA's Consumer Arbitration Rules and if applicable, resolves any outstanding payment obligations, the AAA may consider at its sole discretion, accepting newly filed consumer cases going forward.

Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain electronic case documents in our electronic records system. Such electronic documents may not constitute a complete case file. Other than certain types of electronic case documents that the AAA maintains indefinitely, electronic case documents will be destroyed 18 months after the date of this letter.

If you have any questions, please email ConsumerFiling@adr.org.

Sincerely,

Consumer Filing Team
Email: ConsumerFiling@adr.org
Fax: (877)304-8457